■ MIDTOWN SOUTH PRESERVATION AND DEVELOPMENT COMMITTEE et al., Respondents, v CITY OF NEW YORK et al., Appellants.—Order of the Supreme Court, New York County (Francis N. Pecora, J.), entered on January 13, 1987, which granted plaintiffs' motion for a preliminary injunction and denied defendants' cross motion to dismiss the complaint, is unanimously modified on the law, the facts and the exercise of discretion to the extent of denying the motion for a preliminary injunction, and otherwise affirmed, without costs or disbursements.

Plaintiffs, who include or represent a variety of businesses, merchants, residents, property owners and local organizations, seek declaratory and injunctive relief arising out of defendant City of New York's practice of sheltering homeless families in a section of the Borough of Manhattan bordered by 21st Street, 35th Street, Third Avenue and Broadway (the Midtown South area). Although the Midtown South area is predominantly commercial in character, it does contain substantial residential development. Within the boundaries of this neighborhood are situated eight hotels, comprising approximately 14% of the 58 hotels to which the city regularly refers the homeless. These hotels house 26% of the municipality's homeless families. In that regard, it should be noted that defendant is legally obligated to provide shelter to homeless families *(see, McCain v Koch,* 117 AD2d 198), and there are some 15,000 parents and children who must be sheltered each night.

Approximately every three months, the city's Human Resources Administration (HRA) conducts a survey to locate appropriate hotels. The HRA telephones hotels throughout the five boroughs and, on occasion, in Nassau and Westchester Counties, inquiring whether they are willing to accommodate homeless families and, if so, how many rooms are available and at what rate. Sometimes hotel owners approach HRA without having been contacted and volunteer to house homeless families. The city asserts that it has no contract with the hotels with which it regularly does business and that it is not required in any way to fill a certain number of rooms or make any referrals. According to defendants, referrals are made by employees of the Division of Housing of the Crisis Intervention Services, a unit within HRA, who, on a daily basis, place telephone calls to all the hotels with which the city regularly does business in order to ascertain current vacancies. If such vacancies exist, the callers ask about the rate and how many people can be accommodated. Reservations are made where warranted, and HRA refers the families involved to the hotels. The agency then issues two-party checks payble to both the particular family and the hotel in the amount of that hotel's stated rate.

The city contends that HRA has no plan or "policy" to target the Midtown South area as a receptacle for homeless families. Rather, HRA refers people to hotels in that neighborhood, as it does to other parts of the city, because these hotels have vacancies and are willing to accept families on public assistance. Plaintiffs, on the other hand, argue that defendants have adopted a "policy" of sheltering homeless families in the Midtown South area, the results of which have had a dramatic and deleterious impact on the neighborhood. They allege that the concentration of homeless families in an unfamiliar, largely commercial area has become a catalyst for crime, prostitution, drug activity and general decay and that local services, such as sanitation, police, and schools, have been overwhelmed. As a consequence, plaintiffs urge, property owners and merchants are experiencing unjustified economic loss, while residents and workers have become increasingly concerned about their safety and well-being.

It is plaintiffs' position that the city's "policy" is subject to the mandates of the State Environmental Quality Review Act (SEQRA), the regulations promulgated thereunder and the City Environmental Quality Review procedures (CEQR). (ECL 8-0101 *et seq.;* 6 NYCRR 617.1 *et seq.;* NY City Executive Order No. 91, Aug. 24, 1977.) Since the city's actions affect the

"existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character" (ECL 8-0105 [6]), plaintiffs contend, defendants must comply with the requirements of SEQRA before undertaking an "action" within the meaning of the statute. ECL 8-0105 (4) defines actions to include:

"(i) projects or activities directly undertaken by any agency; or projects or activities supported in whole or part through contracts, grants, subsidies, loans, or other forms of funding assistance from one or more agencies; or projects or activities involving the issuance to a person of a lease, permit, license, certificate or other entitlement for use of permission to act by one or more agencies;

"(ii) policy, regulations, and procedure-making."

However, "actions" specifically exclude official acts of a ministerial nature that do not involve the exercise of discretion. (ECL 8-0105 [5] [ii].) The State regulations implementing SEQRA in 6 NYCRR 617.2 (b) construe actions that fall within the statutory purview as:

"(1) projects or physical activities, such as construction or other activities which change the use or appearance of any natural resource or structures, which:

"(i) are directly undertaken by an agency; or

"(ii) involve funding by an agency; or

"(iii) require one or more permits from an agency or agencies;

"(2) planning activities of an agency that commit the agency to a definite course of future decisions;

"(3) agency rule, regulation, procedure and policy making; and

"(4) combinations of the above."

CEQR also contains a definition of action which is consistent with the foregoing. Plaintiffs and defendants sharply dispute the issue of whether HRA's practice of referring homeless families to hotels in the Midtown South area constitutes the sort of action or policy which necessitates the preparation of an environmental impact statement (EIS) prior to the implementation of that policy. (ECL 8-0109.) Pursuant to ECL 8-0109 (2), an EIS shall, among other enumerated items, set forth a description of the proposed action, the long-term and short-term environmental impact of the action, any unavoidable adverse environmental effects and alternatives to the proposed action. Emergency actions, however, are exempt

even if the emergency has existed for a significant period of time. *(Matter of Board of Visitors v Coughlin,* 60 NY2d 14.) The New York State Court of Appeals has also determined that SEQRA demands that an agency consider the potential long-term secondary displacement of residents and businesses and its effect on population patterns, community goals and neighborhood character even where there is no separate impact on the physical environment. *(Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359.)

In granting plaintiffs' application for a preliminary injunction, the Supreme Court concluded that: "The City would have this court believe that the fact that 26 percent of the homeless in this City are placed in the Midtown South area is mere coincidence. The statistics speak for themselves. It is apparent that the City is attempting to house as many homeless families as possible in the Midtown South area and that this is, in fact, the City's policy." The court also found that plaintiffs' allegations are basically unrefuted by the city and that, moreover, plaintiffs have demonstrated a likelihood of success on the merits and that they will suffer irreparable harm absent preliminary injunctive relief. We disagree. An examination of the record herein does not indicate that the undisputed material facts are such that plaintiffs are likely to ultimately prevail on the merits or that they have shown that the balancing of the equities is in their favor. *(See, Chester Civic Improvement Assn. v New York City Tr. Auth.,* 122 AD2d 715; *Bizar v Ohrenstein,* 119 AD2d 445; *Faberge Intl. v Di Pino,* 109 AD2d 235; *Little India Stores v Singh,* 101 AD2d 727.)

The city's activities in referring homeless families to particular hotels consist of telephone calls to hotels throughout the City of New York and even outside the municipality's borders, inquiries concerning whether these hotels will accept people on public assistance, how many rooms are vacant and at what rate, and providing notification to homeless families with respect to which hotel can accommodate them. The city, of course, also pays the cost of the hotel rooms. At this time, there is no evidence in the record that HRA is engaged in steering people in disproportionate numbers to hotels in the Midtown South area or has otherwise adopted a plan or policy to that effect. Nor is it evident that finding shelter for homeless families is the sort of action contemplated by SEQRA such that an EIS is mandated. It does not appear that the referral process is being carried out in accordance with any express rules, regulations or procedures. On the contrary, it

may well be that the city's current practices are the consequence of the lack of planning in dealing with the crisis in housing for the homeless. In the absence of a clear right to the relief requested, as there is in the present matter, and where that right depends upon an issue which is in dispute, an injunction does not lie.

Plaintiffs have also raised claims in which they assert noncompliance with section 349 of the New York City Charter and violation of their right to the equal protection of the law pursuant to the Federal and State Constitutions. Although the Supreme Court did not address itself to these causes of action, it should be stated that there seems to be even less merit to these allegations than the one brought under SEQRA and CEQR. However, dismissal of the complaint is premature since plaintiffs are entitled to an opportunity to further develop the facts surrounding HRA's referral of homeless families to hotels in the Midtown South area. Concur—Sullivan, J. P., Asch, Milonas, Kassal and Ellerin, JJ.