*551 OPINION OF THE COURT
Stephen G. Crane, J.
In this CPLR article 78 proceeding, petitioners challenge respondents’ selection of Piers 35 and 36 as the site for a multiagency garage and fueling facility (the facility) for respondents Department of Sanitation (DOS) and Department of Health (DOH). Petitioners seek a judgment declaring invalid respondents’ selection of these piers for, inter alla, failure to comply with the Criteria for locating City facilities (the Fair Share Criteria). (NY City Charter §§ 203, 204.)
Piers 35 and 36 are located on the East River and South Street, at the foot of Clinton Street and between Rutgers and Montgomery Streets, in the City of New York. The piers are City-owned wharf property which consist of a bulkhead, pier and uplands area. Several City agencies currently make use of these piers.
Respondents propose to move DOS’s District 3 garage, District 3A broom depot, and District 6 garage to space in the southern portion of Pier 36. DOS intends to store 175 vehicles at Pier 36; it will provide on-site maintenance for these vehicles, as well as on-site fueling, for DOS use only, in the northern portion of the site. Respondents also propose to move the DOH garage to this northern portion to store no more than 50 vehicles. DOH will provide on-site maintenance, but no fueling.
The new facility will require the renovation of both piers. The shed building on Pier 36 will be renovated and a new mezzanine created. Pier 35 will be restored to its previous use for vessel tie-up and emergency fire access to the rear apron of Pier 36. Finally, the renovation will include the construction of bicycle and jogging paths along South Street.
In order for the DOS and DOH facility to be relocated, the project necessitated a myriad of governmental and public review which took approximately three years. As required by New York City Charter § 197-c, the Department of General Services (DGS) submitted both the Uniform Land Use Review Procedure (ULURP) site selection application and its Response to Criteria for the Location of City Facilities (Fair Share Criteria) for review by the City Planning Commission (CPC). The application was reviewed by the community board in which the proposed project is to be located, as well as the borough president (NY City Charter § 197-c [b]). Numerous public hearings were held and modifications were made to *552 DGS’s application. At the conclusion of the hearings and after consideration of the proposal, its modifications, the recommendations, and the environmental impacts, a majority of the CPC voted to approve the proposal. CPC’s decision then was subject to review and action by the City Council (NY City Charter § 197-d [b] [2]).
The City Council held public hearings on the proposal (NY City Charter § 197-d [c]), and in response to concerns raised during this process, DGS again modified the amended proposal, including recommendations by the City Council. With these modifications, the City Council adopted a resolution on October 8, 1992 approving the site selection of the CPC. The Mayor had the authority to disapprove the City Council’s resolution (see, NY City Charter § 197-d [e]). He did not disapprove.
Petitioners allege that the selection of Piers 35 and 36 for the DOS and DOH facility is invalid because the respondents failed to conduct the required alternative site analysis. Petitioners allege that rule 4.1 (c) of the Fair Share Criteria (62 RCNY Appendix A) specifically directs consideration of privately owned, as well as City-owned, property for the location of City facilities. Because DGS limited its site selection analysis to City-owned properties and only one privately owned site, petitioners claim that the Fair Share Criteria were violated.
In addition, petitioners allege that the proposal fails to further the requirement for the fair distribution of City facilities because the Lower East Side and Chinatown communities already accommodate a grossly disproportionate share of City facilities. Among the City facilities already located there, petitioners list 4 jails or detention centers, 11 drug treatment centers, and 12 homeless shelters which service more than 25% of the City’s homeless population.
Petitioners also argue that the proposal does not include an appropriate analysis of the community’s needs for services, and that the respondents did not exercise due regard for the social and economic impacts of the facility upon the areas surrounding the site. They assert that the DOS and DOH facility is not compatible with and will adversely affect the surrounding neighborhood as a result of the increased noise, pollution, and traffic.
The Fair Share Criteria are "designed to further the fair distribution among communities of the burdens and benefits *553 associated with city facilities, consistent with community needs for services and efficient and cost effective delivery of services and with due regard for the social and economic impacts of such facilities upon the areas surrounding the sites.” (NY City Charter § 203 [a].) The purpose of the Criteria is to foster neighborhood stability and revitalization by furthering the fair distribution among communities of City facilities. The guidelines set forth eight considerations the City must undertake in order to fulfill this purpose. The City must seek to: (1) site facilities equitably by balancing the considerations of community needs for services, efficient and cost-effective service delivery, and the social, economic, and environmental impacts of City facilities upon surrounding areas; (2) base its siting and service allocation proposals on the City’s long-range policies and strategies, sound planning, zoning, budgetary principles, and local and City-wide land use and service delivery plans; (3) expand public participation by creating an open and systematic planning process; (4) foster consensus building; (5) plan for the fair distribution among communities of facilities providing local or neighborhood services in accordance with relative needs among communities for those services; (6) lessen disparities among communities in the level of responsibility each bears for facilities serving Citywide or regional needs; (7) preserve the social fabric of the City’s diverse neighborhoods by avoiding undue concentrations of institutional uses in residential areas; and (8) promote government accountability by fully considering all potential negative effects, mitigating them as much as possible, and monitoring neighborhood impacts of facilities once they are built. The Criteria are intended to guide the process of siting City facilities, and the intent of the guidelines is to improve, not to obstruct, this process.
To facilitate the fair distribution of City facilities, the DGS is required to consider five criteria for the siting of its facility. For actions subject to ULURP review, the CPC also is required to consider the same five criteria in its review of the site selection: (a) compatibility of the facility with existing facilities and programs, both City and non-City, in the immediate vicinity of the site; (b) the extent to which neighborhood character would be adversely affected by a concentration of City and non-City facilities; (c) suitability of the site to provide cost-effective delivery of the intended services. Consideration of sites shall include properties not under City ownership, unless the agency provides a written explanation of why it is *554 not reasonable to do so in this instance; (d) consistency with the locational and other specific Criteria for the facility identified in the statement of needs or in a subsequent submission to a borough president; and (e) consistency with any plan adopted pursuant to section 197-a of the New York City Charter.
There are additional criteria applicable for the siting of regional and City-wide facilities, which by definition include the DOS and DOH facility, and the significant expansion of them. These criteria are: (a) the need for the facility or expansion; (b) distribution of similar facilities throughout the City; (c) size of the facility; and (d) adequacy of the streets and transit to handle the traffic generated by the facility.
A review of the DOS’s Response to the Fair Share Criteria and the CPC’s analysis thereof reveals that the guidelines were not followed in making the site selection determination. First, DOS’s ULURP application indicates that it did not analyze any alternative sites since Piers 35 and 36 were the only City-owned parcels located in lower Manhattan that could accommodate the entire project. DOS’s response also indicates that "[n]on-city sites were simply not considered since the time and money which would be required to locate and acquire such sites was deemed to be contrary to the purpose and goal of the proposed project and site selection.” It was only in response to the CPC’s demand for additional information pertaining to DOS’s alternative site analysis that that information was provided.
DOS indicated that it "identified” a total of seven alternative sites for the location of the facility. Of the seven sites identified, six were City-owned and only one was privately owned. The rejection by DOS of the five alternative City-owned sites was based on lack of sufficient space, inappropriate location in communities outside of those to be serviced, zoning restrictions, legal obstacles, excessive costs, and time constraints. The single private site identified by DCS was owned by Con Edison which, respondents allege, was unwilling to relinquish it. Respondents deemed acquisition of the property infeasible as it would have involved lengthy litigation.
The guidelines do not dictate that respondents consider a minimum number of either City or privately owned sites in the fair share analysis. However, respondents’ analysis of alternative sites must be meaningful. Thus, although it generally will be more "cost-effective” for the City to locate its *555 facilities on City-owned property, and the acquisition of privately owned property will almost always involve associated costs, these are not proper considerations for the selection of a site under the fair share analysis. To allow respondents to rely on this reasoning in its rejection of alternative sites renders the Fair Share Criteria illusory because it will dictate the outcome in the siting of all City facilities. Were this the analysis the Criteria intended, the City never would have occasion to locate City facilities on privately owned property. Thus, the mere fact that it would involve less time and expense for respondents to locate the DOS and DOH facility on Piers 35 and 36 is not sufficient to satisfy the Fair Share Criteria.
Moreover, respondents did not consider the compatibility of the facility with existing City and non-City facilities in the immediate vicinity of the site. DOS examined only those facilities within a 400-foot radius of the site, which include several City agencies already located on the piers, to wit, the EMS, DOT and Tactical Narcotics Team facilities. While the proposed use of the site as a garage and fueling facility is compatible with the present use of the site by these other City agencies, DCS did not determine whether the proposed use was compatible with other facilities not located on the piers. Although DCS acknowledged that the character of the new facility is distinct from the adjacent residential and commercial uses, it offered only the contention that "these types of uses have historically coexisted in the area of the proposed facility.” Respondents fail to recognize that the Criteria seek to ensure that this relationship is fair and guards against one community being overburdened in its coexistence with City facilities. Moreover, that these types of uses have coexisted in the past does not warrant the conclusion that the DOS and DOH facility automatically are compatible with existing programs. Finally, respondents make no mention of compatibility of the facility with the 12 schools within a one-half-mile radius of the facility, one of which is within one block of the proposed site.
In its most egregious dereliction, respondents completely failed to consider the extent to which the neighborhood character would be adversely affected by a concentration of City and non-City facilities. Apparently, respondents reasoned that since there are a large number of facilities already located in the vicinity of the site, the addition of the DOS and DOH facility would not adversely affect the area. The Criteria *556 require that respondent consider the effect of the concentration of facilities in the area and it is clear that DGS failed to engage in such consideration.
In sum, the court finds that as a matter of law, DGS has failed to comply with the Fair Share Criteria in its site selection analysis. DGS’s Response to the Fair Share Criteria lacks the analysis required to determine whether this community is indeed harboring its "fair share” of City facilities or whether it has become, as petitioners assert, a "de facto dumping ground” for City facilities. DGS’s consideration of the Criteria does not satisfy the purposes for which the Criteria were implemented, that is, to further the fair distribution among communities of City facilities; it merely reiterated the Fair Share Criteria without conducting any meaningful analysis thereunder. The court is not attempting to override the respondents’ determination as arbitrary or lacking a rational basis. Rather, the court perceives that no consideration was accorded to the factors bearing on "fair share.” To pay lip service to these factors is not enough. Respondents needed to engage in an analysis of the facilities already located in petitioners’ community and compare these with the municipal facilities sited in other communities where the relocated DOS and DOH proposed installation could have been accommodated. This was never done. Accordingly, that branch of the petition seeking to declare invalid respondents’ selection of Piers 35 and 36 for failure to comply with the Fair Share Criteria is granted. The petition is otherwise denied.