[597 NYS2d 318]

WEST 97TH-WEST 98TH STREETS BLOCK ASSOCIATION et al.,
Respondents-Appellants, v VOLUNTEERS OF AMERICA OF
GREATER NEW YORK et al., Appellants-Respondents.

First Department, May 6, 1993

304

### APPEARANCES OF COUNSEL

*Jerry H. Goldfeder* of counsel, New York City *(Christopher Morik* with him on the brief; *Pesetsky Goldfeder & Bookman,* attorneys), for respondents-appellants.

*Susan Packer* of counsel, New York City *(Richard L. Huff-*

*man* with her on the brief; *Baden Kramer Huffman & Brodsky, P. C.,* attorneys), for Volunteers of America of Greater New York and another, appellants-respondents.

*Elizabeth S. Natrella* of counsel, New York City *(Pamela Seider Dolgow* with her on the brief; *O. Peter Sherwood, Corporation Counsel* for New York City, attorney), for City of New York, appellant-respondent.

*Elizabeth Kane* of counsel, New York City *(West Side SRO Law Project,* attorneys), for *Bernardo Echeverri* and others, appellants-respondents.

### OPINION OF THE COURT

MILONAS, J.

This action involves an attempt by plaintiff block association and certain named individuals to enjoin permanently the operation by defendants, the Volunteers of America of Greater New York and the City of New York, of a multipurpose housing facility for the poor. Prior to May 30, 1989, the building at 305 West 97th Street in Manhattan was a single-room occupancy (SRO) that provided shelter for drug addicts, prostitutes and other undesirables. The Volunteers of America, which was persuaded to develop the property by defendant New York City Department of Housing Preservation and Development under the new Single Room Occupancy Development Loan Program, received a loan of some $5.2 million to purchase and rehabilitate the structure. Although the SRO had 72 apartments, the refurbished building would contain 100 units. According to a Department of Housing Preservation and Development memorandum, dated April 21, 1989, it was stated that:

"Under the terms of the Article XI mortgage, all vacant units available at rent-up and all subsequent re-rentals will be made available to homeless individuals referred by the City's shelter system. An agreement may be worked out with HRA [Human Resources Administration] that would allow some referrals from alternate homeless sources approved by HRA.

"The vacant units will be filled with appropriate homeless individuals selected from a range of ages and backgrounds to create a non-institutional heterogenous environment with persons of varying interests and abilities capable of living independently with the available program supports. A specific target population will be recovering alcoholics coming from the shelter system."

The Supreme Court (Leonard Cohen, J.), by order dated July 6, 1989, directed, in part, that 305 West 97th Street be vacated and that all persons who could establish that they had been in actual possession and residence as of May 30, 1989, plus those specified people who had voluntarily left the premises, could return to live there after the restoration had taken place. A subsequent review of the project by the Volunteers of America explained that its purpose was to serve primarily homeless people. In section II of the report, dealing with the expected population of the project, it was noted that:

"In accordance with the City's loan documents and with Judge Cohen's order regarding prior residents of the building, VOA intends to serve the following people:

"Prior residents of the building who choose to exercise their right to return under Judge Cohen's order

"Homeless adults, men and women, referred to VOA through the NYC Human Resources Administration (HRA) or HRA-approved sources

" 'Housing Needy', working poor, and income eligible people including those participating in rehabilitation or training programs, primarily within the Upper West Side area of the City.

"It is anticipated that the 95 residents will have a range of problems, in addition to their low income status, that is similar to those found in the homeless population being served through the City's shelter system and through not-for-profit agencies supported by the City.

"VOA and HRA will refer and accept residents in the building in accordance with the recently-negotiated '60-20-20' residency plan for supported SRO programs. The actual percentages of residents during the early operations phase may vary considerably from the '60-20-20' model if a high percentage of prior residents exercise their right to return."

In their complaint, plaintiffs allege that it was not until December of 1990 that they first learned that the Volunteers of America was altering its plan for the building by accepting people referred by the Human Resources Administration who would not necessarily be rehabilitated and, thus, capable of working. Moreover, the Volunteers of America purportedly advised plaintiffs in May of 1991 that mentally ill persons recommended by the Department of Mental Health would also be residents, as well as HIV-positive individuals and the homeless generally, regardless of whether or not they could

work. Indeed, defendants concede that, in addition to those who had previously lived at the facility and opted to return, the restored structure would house approximately 35% with mental health problems and 10 to 15% who are HIV-positive but that these individuals would all be needy and otherwise homeless. Therefore, defendants urge, the character and composition of the building has not been substantially modified from the original concept.

The four causes of action assert, respectively, that there has been a violation of the Criteria for Location of City Facilities (Fair Share Rules) that was adopted by the City Planning Commission in December of 1990 pursuant to section 203 of the New York City Charter, that defendants have not complied with the requirements of the Uniform Land Use Review Procedure (ULURP) of the New York City Charter, that they have not prepared an environmental impact statement as mandated by the Environmental Conservation Law of the State of New York (State Environmental Quality Review Act [SEQRA]) and the City Environmental Quality Review Act (CEQR) and that no valid certificate of occupancy has been obtained, rendering the building unfit for occupancy. Consequently, plaintiffs demand a permanent injunction prohibiting defendants from the further use, development or operation of the structure as a residence and compelling them to disallow occupancy of the facility. Defendants thereafter moved to dismiss the complaint on a variety of grounds, and the Supreme Court, in a long and detailed opinion, dismissed with prejudice plaintiffs' SEQRA and CEQR claims, dismissed without prejudice the cause of action relating to the certificate of occupancy, denied the application for a preliminary injunction and denied dismissal of the allegations concerning the Fair Share Rules and ULURP. Plaintiffs and defendants have both appealed.

■ The complaint should have been dismissed in full. The Supreme Court appropriately found that the supposed change in the character of the building was a routine administration determination that rendered it the sort of Type II action that does not require an impact statement (6 NYCRR 617.13 [a], [d] [1], [15]). As the Court observed in *Matter of Briarwood Community Assn. v City of New York* (147 AD2d 639, 640), in discussing the necessity for an environmental impact review "[i]f the statutory requirements have been satisfied, a court may not substitute its judgment or preference for that of the agency". Since no statute or regulation mandates a new

impact statement for the minimal, if any, alteration that was made concerning the nature of the prospective residential population, the court properly dismissed plaintiffs' SEQRA and CEQR cause of action.

The purpose of the plan was, from the very beginning, to rehabilitate the building as a sanctuary for the homeless. Any average population of homeless includes a substantial percentage that is mentally or emotionally disturbed, engages in substance abuse and/or is HIV-positive. Defendants never took the position that the homeless who would be housed in the restored structure would all be healthy and ready for employment. Yet, plaintiffs' lawsuit appears to involve no more than a quibble over what proportion of the homeless residents will be permitted to suffer from a severe psychological or physical impairment when, almost by definition, the homeless are troubled people who are afflicted with various disorders.

■ Similarly, the Fair Share criteria are not applicable here. Even if defendants can be deemed compelled to comply with rules first enacted some five years after they committed themselves to the present project, and the Volunteers of America is not considered to be the kind of private entity specifically exempted from operation of these rules (Fair Share Rules art 3 [a], n 2), the criteria come into force only where the City locates a new facility, significantly expands, closes or significantly reduces the size or capacity for service delivery of existing facilities (NY City Charter § 203). Thus, it is clear that the Fair Share Rules are concerned with the policy implications involved in establishing a particular site for the delivery of certain services. However, the renovation of 305 West 97th Street had no effect, either through expansion or reduction, on the size of an existing facility, and the Volunteers of America will continue to utilize the structure as an SRO. The building will simply have been rehabilitated to render it clean and safe rather than, as previously, dilapidated and poorly managed.

The fact that the homeless receiving refuge therein might be composed of slightly different categories of people than plaintiffs might prefer bears absolutely no relation to the objective intended by adoption of the Fair Share Rules. In addition, the criteria do not cover incidental contracts executed after the site for an anticipated facility has been selected so that the proposed contracts complained of by plaintiffs are also not subject to the Fair Share Rules. Therefore,

the cause of action containing the Fair Share claim should have been dismissed. Plaintiffs further assert that defendants did not conform to the mandates of ULURP. In that connection, section 197-c (a) of the New York City Charter provides that:

"Except as otherwise provided in this charter, proposals and applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation shall be reviewed pursuant to a uniform review procedure in the following categories * * *

"(8) Housing and urban renewal plans and projects pursuant to city, state and federal housing laws".

The challenged referral and service contracts cannot, under any reasonable construction of the law, be found to be for "the use, development or improvement of real property" (see, Matter of Silver v Koch, 137 AD2d 467, 468, lv denied 73 NY2d 702, wherein the Court held that "[t]he employment of Pier 36 to moor a prison barge, temporarily, has not changed its preexisting use"). In the instant situation, the building at issue was previously utilized as an SRO and will continue to be an SRO. Only the identity of some of the tenants will change, and plaintiffs distort the meaning of the statute by insisting that a shift in the composition of the residents at 305 West 97th Street, no matter how inconsequential, requires the implementation of a review procedure. Moreover, the referral of the homeless to, and the provision of necessary services at, one SRO hardly constitutes the type of "plan" envisioned by the ULURP scheme since the disputed contracts do not involve the use of real property nor contemplate any general housing strategy.

Finally, under the circumstances herein, the Supreme Court properly denied plaintiffs' request for a preliminary injunction. Plaintiffs' remaining arguments are without merit. For all of the foregoing reasons, plaintiffs' action should have been dismissed in its entirety.

Consequently, the order of the Supreme Court, New York County (Martin Schoenfeld, J.), entered on December 24, 1991, which denied plaintiffs' motion for a preliminary injunction and granted in part defendants' cross motion pursuant to CPLR 3211 to dismiss the complaint, should be modified on the law to the extent of granting defendants' cross motion to dismiss in full and otherwise affirmed, without costs or disbursements.

MURPHY, P. J., WALLACH and KASSAL, JJ., concur.

Order of the Supreme Court, New York County, entered on December 24, 1991, which denied plaintiffs' motion for a preliminary injunction and granted in part defendants' cross motion pursuant to CPLR 3211 to dismiss the complaint, is modified, on the law, to the extent of granting defendants' cross motion to dismiss in full, and otherwise affirmed, without costs or disbursements.