[635 NYS2d 965]

FERNANDO FERRER, as Borough President of the Bronx, et al., Respondents, v DAVID N. DINKINS, as Mayor of the City of New York, et al., Appellants.

First Department, January 4, 1996

### APPEARANCES OF COUNSEL

*Janet L. Zaleon* of counsel, New York City *(Barry P. Schwartz* on the brief; *Paul A. Crotty, Corporation Counsel* of City of New York, attorney), for appellants.

*Terri S. Blank,* Bronx, for respondents.

### OPINION OF THE COURT

KUPFERMAN, J.

At issue is the City's arrangement for the placement of homeless families in the Wakefield Motor Inn at 691 East 241st Street in the Bronx.

In March 1992, the Wakefield contacted the City and offered its entire complement of 21 rooms for rental to homeless families. After some discussion, nothing was settled, but the City remained interested. When the Wakefield broached the subject again in September 1992, some unspecified accord was reached. It is not disputed that the Wakefield made substantial improvements in its physical plant to accommodate the City, but no written agreement was ever reached. While one room was set aside for the City's use in assisting any homeless families housed there, it is not obliged to make any set or minimum number of referrals. The City does not pay for unoccupied rooms and the Wakefield is not bound to keep any set or mini-

mum number of rooms available for the City or to accept any City referrals.

By letter dated January 15, 1993, the City advised petitioner Ferrer (who is the Borough President of the Bronx) that it was about to begin regularly "referring" homeless families to the Wakefield. Up to 20 of the motel's 21 rooms would be occupied by homeless families, while the 21st room would be "used for social services". The Wakefield would bill $85 per day for each room, which would be outfitted to comply with criteria of the State Department of Social Services. The referred families would "remain in residence until such time as HRA can identify a suitable Tier II placement or the family secures permanent housing". The City identified seven other Bronx hotels to which it referred homeless families. The City has admitted that it sent similar letters to other "local elected officials and community representatives" on the same day.

Petitioner Ferrer took the position that the City was required to undertake a ULURP (Uniform Land Use Review Procedure [NY City Charter § 197-c]) filing, as well as a City-wide Statement of Needs pursuant to New York City Charter § 204 (g), prior to any placements. Very shortly afterward, the petitioners commenced this proceeding.

In its decision, the IAS Court concluded that the letter from the City to petitioner Ferrer evidenced "a meeting of the minds" with the Wakefield. It found that the City is "evading the intended mandates" of the City Charter by calling the arrangement with the Wakefield a day-rate agreement when it was actually a de facto lease. It further found "substantial elements of a lease" present, evidencing the "manifest intent of the parties" and "lead[ing] ineluctably to the conclusion that they have entered into an oral lease". The court found it significant that the City had gained exclusive rights to all 21 rooms, with no non-Tier II party occupying any Wakefield room, had agreed to a fixed day rate, and had arranged for payment to the Wakefield either by two-party check or directly. It also noted that a referred Wakefield resident could remain in the residence until some indefinite time when another placement or home was available, with access to on-site services. In light of "the somewhat extensive renovations of the units and the understanding" between the City and the Wakefield, the IAS Court found that the Wakefield owner's right to "rent [rooms] to whomever [he] chooses" was "empty" of probative value and that the Wakefield had, therefore, been turned into a de facto Tier II shelter pursuant to a "housing plan" that

involved placement in "at least six other similar premises in the Bronx". We disagree.

Section 197-c (a) of the New York City Charter affects "the use, development or improvement of real property subject to city regulation", and imposes "a uniform review procedure" commonly known as ULURP. At issue is the distinction between the City's leasing real property, which requires a ULURP pursuant to section 197-c (a) (11), and its mere license to make day use of such property.

Initially, we note that *Davis v Dinkins* (154 Misc 2d 518), upon which the IAS Court's decision is primarily based, has been overturned (206 AD2d 365, *lv denied* 85 NY2d 804). *Davis* involved a motel in Jamaica, Queens, the Kennedy Inn. The motel's owner had contacted the City to arrange for homeless placement. Negotiation and inspection followed. The Kennedy Inn was required to make improvements and arrange for on-site catering. There was neither a commitment by the Kennedy Inn to reserve any particular block of rooms for Human Resources Administration (HRA) placement nor a City commitment to make a minimum number of referrals. The City did not pay for unoccupied rooms. The Inn set its usual day rate for each room. Payment was either by a two-party check or a direct wire transfer. Families were required neither to stay at the Kennedy Inn once placed nor to leave after a set amount of time. The hotel made on-site space available for social services. HRA sent the Queens Borough President a letter that included an indication that the homeless families would have exclusive occupancy of the Kennedy Inn (154 Misc 2d, *supra,* at 520-522). The Kennedy Inn's one significant distinction from this case is that only 150 of 189 rooms were made available *(supra,* at 520).

While the Supreme Court found a lease in *Davis*, a majority of the Appellate Division disagreed. The majority found missing the key element of absolute surrender of possession and control by the owner. It was considered significant that the City did not occupy all rooms of the hotel, that the Kennedy Inn did not charge a monthly rate, that placed families were kept in the Inn's records in the same way as any other guests of the Kennedy, and that there was neither a City obligation to refer a set number of families nor a Kennedy Inn obligation to accept any referrals (206 AD2d, *supra,* at 366-367).

Accordingly, the majority concluded that, "[u]nder these circumstances, it cannot be said that a lease existed between the City and the Kennedy Inn for any portion of the City's use of the hotel." (*Supra,* at 367-368.) In the view of the dissenting

Justice, however, the City: "has thus engaged to fill 150 rooms at the Inn with homeless families, and to use the former night club and common areas for the provision of services to the families, to the exclusion of all others. Even though the intended period of occupancy of each homeless family is somewhat indefinite, the rate of rent is fixed at $105 per room per day. It is therefore indisputable that the City entered into a master lease arrangement with the Inn, as distinguished from a 'license,' since the respondents obtained exclusive and absolute control of the premises. In effect, a homeless housing center or complex was established" (*supra*, at 369-370 [Friedmann, J., concurring in part and dissenting in part]).

At bar, the City urges that the Second Department's decision in *Davis* is controlling, while the petitioners urge us to adopt the reasoning of the dissent.

As to the distinction between a lease and a license, the leading case is *Miller v City of New York* (15 NY2d 34). At issue was a City agreement with a private business granting it the right to construct a golf-driving range in a public park. In finding that such arrangement constituted a lease of park property, the Court held in pertinent part:

"Although the contract speaks of a 'license' and avoids use of the word 'lease' it contains many provisions typical of a lease and conferring rights well beyond those of a licensee or holder of a mere temporary privilege * * *. Some of those elements are: exclusive use of a specifically bounded 30-acre area; a 20-year term; rental fixed at a percentage of gross receipts; and construction and repair by grantee at its own cost of extensive buildings, a large parking lot, fences, flood-lighting, etc. * * *

"The difference between a license and a lease is plain enough although in borderline cases sometimes difficult to apply. * * * A document calling itself a 'license' is still a lease if it grants not merely a revocable right to be exercised over the grantor's land without possessing any interest therein but the exclusive right to use and occupy that land" (*supra*, at 37-38).

Thus, the question is whether or not the arrangement here is in the nature of a lease, as indicated by certain key elements, rather than a mere temporary privilege (*see, Richmond Children's Ctr. v Fireman's Fund Ins. Cos.*, 128 AD2d 849; *see also, Engblom v Carey*, 677 F2d 957, 963 [2d Cir]) and, what rights do the City's payments secure? (*See, e.g., Jobco-Mitchel Field v Lazarus*, 156 AD2d 426, 427, *lv denied* 75 NY2d 711.) Crucial to any determination that there is a lease is a finding

that the City's occupancy of the land is the functional equivalent of a landowner's, lacking only the actual transfer of title.

On the other hand, the purpose of such review procedures as ULURP is to identify, at the earliest possible stage, those activities that will have a significant impact on the community. (*See, e.g., Matter of Hazan v Howe*, 214 AD2d 797, 798 [State Environmental Quality Review Act (SEQRA)]). A ULURP review allows the community to measure the impact of the proposed land use and, where possible, identify alternatives. (*See, e.g., Orth-O-Vision, Inc. v City of New York*, 101 Misc 2d 987, 1005.)

Like the pertinent focus of a lease/license question, then, the pertinent focus of a review question is on the nature of the land use. (*See, e.g., Matter of Hart Is. Comm. v Koch*, 137 Misc 2d 521, 527, *mod on other grounds* 150 AD2d 269, *lv denied* 75 NY2d 705.) On both questions, the prevailing issue is whether or not the City's interests will so predominate the use of the land, to the exclusion of the owner's, that the effect on the community will be the same as if the City had taken title to the land.

In *Davis, (supra),* the dissent treated the question as a mechanical comparison of the agreement with a series of elements. The majority properly shunned this use of a checklist and favored, as we do, a direct analysis of the City's use against the "absolute surrender of control" standard. There, the Kennedy Inn remained a hotel, held by its owners, who treated referred families as motel guests, and who had the absolute right to end the City's practice of referring new families. The owners still had both possession and control. Any surrender they may have made to the City was simply not absolute. (*See, American Jewish Theatre v Roundabout Theatre Co.*, 203 AD2d 155, 156.) The same is true at bar.

Contrary to petitioner's argument, it is not a key distinction that the Wakefield is letting 21 of 21 rooms, while the Kennedy Inn let only 150 of 189. The focus must be on the nature of the use and the nature of its impact on the community. No one could reasonably argue that a land use involving 150 homeless families will have a meaningfully lesser impact on the surrounding residential community, merely because there will also be another 39 transient guests, than a use involving 20 such families. The key distinction is who controls the land. The Wakefield's owner, not the City, will be running the Wakefield.

This result is consistent with prior cases in that the use of a prison barge has been held not to be a lease, because the City

would make only short term use of a space, which use was revocable by the owner. (*See, Matter of Silver v Koch*, 137 AD2d 467, 468, *lv dismissed* 71 NY2d 889, *lv denied* 73 NY2d 702; *see also, Mauldin v New York City Tr. Auth.*, 64 AD2d 114, 116 [where the grantor has the right to withdraw at any time, the "most essential attribute" of a lease is missing].) Likewise, a significant change in the number of homeless people placed in a single-room occupancy hotel was emphatically held not to be the use, development or improvement of real property. (*See, West 97th-W. 98th Sts. Block Assn. v Volunteers of Am.*, 190 AD2d 303, 309.)

Moreover, the fact that the City has been able to obtain renovations from the Wakefield's owner is not determinative. In the first place, there is no showing that the renovations effect a fundamental change to the physical plant of the hotel, which only an owner or its full equivalent could make. (*Cf., Community Planning Bd. No. 4 [Manhattan] v Homes for the Homeless*, 158 Misc 2d 184, 189 [major gutting and architectural changes].) In the second place, there is no showing that the City has *continuing* power to *demand* changes—to *control* the physical plant of the building—which an owner or lessor would have.

Likewise, the system of payment is not crucial. In *Midtown S. Preservation & Dev. Comm. v City of New York* (130 AD2d 385, 388), a similar arrangement was found consistent with characteristics of a mere referral system, and not "the sort of action contemplated by SEQRA such that an EIS is mandated." The payments remain at a day rate and not a monthly rate, and they remain tied to specific guests and not an overarching use of the realty itself. (*See, Matter of Davis v Dinkins*, 206 AD2d, *supra*, at 367.)

■ As for the so-called "fair share" review, a facility is considered a City facility if it is "used or occupied * * * to meet city needs [and] is located on real property owned or leased by the city or is operated by the city or pursuant to a written agreement on behalf of the city" (NY City Charter § 203 [c]). Pursuant to section 203, the City Planning Commission has enacted rules (Criterial for Location of City Facilities) set forth in the record, which require a fair share review only if the property is owned by the City or leased by the City *and* is greater than 750 square feet, or used primarily for a program operated pursuant to a written agreement providing that minimums of 50% *and* $50,000 of the annual funding will come from the City.

The petitioners cannot show that the City owns the Wakefield. They also cannot show that the City uses the Wakefield pursuant to a written agreement and, in any event, they have not shown that the Wakefield gets both $50,000 and 50% of its annual funding from the City. It may be likely that the Wakefield occupies more than 750 square feet, but the petitioners have not shown that. Thus, there has been no satisfaction of the threshold requirements for a fair share review pursuant to article 9 of the Planning Commission's rules.

Even if the petitioners had made such a threshold showing, a privately run facility is not subject to fair share requirements. (*See, Community Planning Bd. No. 4 [Manhattan] v Homes for the Homeless*, 158 Misc 2d, *supra*, at 192.) This holding is consistent with the policy purpose of the fair share rules, which focuses on the ultimate possession and control of the land. In that regard, "[t]he purpose of the Criteria is to foster neighborhood stability and revitalization by furthering the fair distribution among communities of City facilities." (*Matter of Silver v Dinkins*, 158 Misc 2d 550, 553, *affd* 196 AD2d 757, *lv denied* 82 NY2d 659.)

Accordingly, the judgment of the Supreme Court, Bronx County (Luis A. Gonzalez, J.), entered April 15, 1994, which granted the petition to the extent of directing respondents to conduct ULURP and "fair share" proceedings within 20 days, should be modified, on the law, the petition denied in all respects and the proceeding dismissed. As so modified, the judgment is otherwise affirmed, without costs.

SULLIVAN, J. P., NARDELLI and WILLIAMS, JJ., concur.

Judgment, Supreme Court, Bronx County, entered April 15, 1994, which granted the petition to the extent of directing respondents to conduct Uniform Land Use Review Procedure and "fair share" proceedings within 20 days, modified, on the law, the petition denied in all respects and the proceeding dismissed and as so modified the judgment is otherwise affirmed, without costs.