■ In the Matter of JAMES DAVIS et al., Respondents-Appellants, v DAVID N. DINKINS et al., Appellants-Respondents. [613 NYS2d 933] —In a proceeding pursuant to CPLR article 78, *inter alia,* for an injunction against using the Kennedy Inn to house homeless families, and to compel proceedings pursuant to the Uniform Land Use Review Procedure, the appeal, as limited by the appellants-respondents' brief, is from so much of a judgment of the Supreme Court, Queens County (Posner, J.), dated June 18, 1992, as directed the appellants-respondents to conduct the Uniform Land Use Review Procedure pursuant to New York City Charter § 197-c, and "fair-share" proceedings pursuant to New York City Charter §§ 203 and 204, and the petitioners cross-appeal from so much of the judgment as denied them injunctive relief and dismissed their cause of action pursuant to General Municipal Law § 51.

Ordered that the judgment is reversed insofar as appealed from, on the law, the second decretal paragraph thereof,

which directed proceedings pursuant to the Uniform Land Use Review Procedure pursuant to New York City Charter § 197-c and "fair-share" proceedings pursuant to New York City Charter §§ 203 and 204 is deleted, and that relief is denied; and it is further,

Ordered that the judgment is affirmed insofar as cross-appealed from; and it is further,

Ordered that the appellants-respondents are awarded one bill of costs.

The petitioners, residents of Queens, commenced this action to enjoin the appellants-respondents (hereinafter referred to collectively as the City) from housing up to 150 homeless families in the Kennedy Inn, a hotel in Queens. The petitioners argued that such a sheltering of homeless persons would adversely affect the area and strain its limited resources. Further, the petitioners alleged that because this arrangement constituted a leasing arrangement between the City and the Kennedy Inn, it was subject to the Uniform Land Use Review Procedure (hereinafter ULURP) and a "fair-share" hearing pursuant to New York City Charter §§ 203 and 204. The petitioners also brought a taxpayers' cause of action pursuant to General Municipal Law § 51, arguing that such a leasing arrangement was illegal. The Supreme Court, finding that an oral lease existed between the Kennedy Inn and the City, agreed, and directed proceedings pursuant to ULURP and a fair-share hearing. All other relief was denied. We now modify to deny the petitioners all relief.

As a threshold issue, the City argues that the petitioners lack standing to challenge this administrative action (see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406). However, we find the petitioners' allegations sufficient to support standing (see, Society of Plastics Indus. v County of Suffolk, 77 NY2d 761; Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428; Matter of Har Enters. v Town of Brookhaven, 74 NY2d 524; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, supra, at 406). However, such a finding is academic, as we hold that no lease existed between the City and the Kennedy Inn, a finding critical to the bulk of the petitioners' claims.

The central distinguishing characteristic of a lease is the surrender of absolute possession and control of property to another party for an agreed-upon rental (see, Feder v Caliguira, 8 NY2d 400; Slutzky v Cuomo, 114 AD2d 116). In order for an agreement, oral or written, to be enforceable as a lease,

all the essential terms must be agreed upon *(see, Mur-Mil Caterers v Werner,* 166 AD2d 565). These essential terms include the area to be leased, the duration of the lease, and the price to be paid *(see, Bernstein v 1995 Assocs.,* 185 AD2d 160). If any of these essential terms are missing and are not otherwise discernible by objective means, a lease has not been created *(see, Miller v City of New York,* 15 NY2d 34; *Ross v Mail Order Merchandising,* 128 AD2d 514; *Mur-Mil Caterers v Werner, supra,* at 565). Here, neither the area to be leased nor the length of the term has been agreed upon or is discernible by objective means. Specifically, there was never any agreement or obligation to rent any particular number of rooms, nor was there any agreement or obligation to rent for any particular time period. The City agreed only to refer homeless families to the Kennedy Inn for the occupancy of "at most" 150 of the hotel's 189 rooms. The City made no commitment to fill all 150 rooms, or, indeed, any room, and, the City was under no obligation to pay rent on rooms which were not occupied. Similarly, the Kennedy Inn was under no obligation to keep any number of rooms available for homeless families, or to rent rooms to any of the families which were referred. Each homeless family was required to register upon arrival at the hotel as would any other guest at a hotel. The families were charged at a rate of $105 per day. The families gave their authorization to the Human Resources Administration to wire transfer their Federal, State, and City housing assistance funds directly to the hotel to pay any room fees incurred. Contrary to the assertion by the dissent, rent was not paid by electronic transfer on a month-to-month basis. Rather, the record indicates that wire transfers were made at "various periods of time", and "could be done a number of times during the course of the month depending upon how the bill is reconciled out". Moreover, the families were charged only for the number of days which they actually stayed in a room, and not at a monthly rate. In sum, it is uncontroverted on this record that neither the City nor the Kennedy Inn had any contractual rights or obligations to lease any specified area for any specified length of time. The City could, with impunity, refuse to refer any families to the Kennedy Inn, and the Kennedy Inn would be without legal recourse. Concomitantly, the Kennedy Inn was under no obligation to accept any family referred by the City, and retained the unfettered power to end the stay of a family, and has done so on numerous occasions, with no legal recourse available to the City.

Under these circumstances, it cannot be said that a lease

existed between the City and the Kennedy Inn for any portion of the City's use of the hotel. Accordingly, the City's use of the hotel was not subject to ULURP and that portion of the judgment holding to the contrary must be reversed *(see,* NY City Charter § 197-c [a]). Moreover, because this alleged lease was the alleged "illegal [official] act" which formed the basis of the taxpayers' suit, this suit was properly dismissed *(see,* General Municipal Law § 51; *Mesivta of Forest Hills Inst. v City of New York,* 58 NY2d 1014; *Korn v Gulotta,* 72 NY2d 363).

In addition, the petitioners requested a "fair-share" hearing pursuant to New York City Charter §§ 203 and 204. However, as the Kennedy Inn is not a "city facility" as that term is defined under the statute, no fair-share hearing is required *(see,* NY City Charter § 203 [c]).

Finally, as the petitioners have not stated a cause of action, there is no basis for injunctive relief. Copertino, J. P., Santucci and Goldstein, JJ., concur.

Friedmann, J., concurs in part and dissents in part and votes to affirm the judgment in its entirety, with the following memorandum: Contrary to the majority's finding, the record at bar establishes that the municipal respondents entered into an oral lease with the owners of the Kennedy Inn in southeast Queens for the purpose of housing homeless families for an economically predictable (i.e., long-term) period of time. Accordingly, I respectfully dissent, and would affirm the provisions of the judgment which directed the respondents to conduct uniform land use review proceedings pursuant to New York City Charter § 197-c (Uniform Land Use Review Procedure [ULURP]), as well as a "fair-share" hearing required by New York City Charter §§ 203 and 204.

It is well established that a "lease" exists when there is "transfer of absolute control and possession of property at an agreed rental" *(Feder v Caliguira,* 8 NY2d 400, 404; *Statement, Inc. v Pilgrim's Landing,* 49 AD2d 28, 33). Normally, all essential terms must be established or capable of objective determination, including the area to be leased, the duration of the lease, and the price to be paid *(see, Bernstein v 1995 Assocs.,* 185 AD2d 160, 162; *Mur-Mil Caterers v Werner,* 166 AD2d 565, 566).

Under the terms of the exclusive covenant at bar, negotiated between September 1991 and February 1992, the Kennedy Inn (hereinafter the Inn) agreed to make available up to 150 of its 189 rooms, to be occupied by homeless families

referred by the Human Resources Administration (hereinafter HRA). The agreed-upon rate per room was $105 per day, including meals ordered from a caterer who serviced the other homeless shelters run by the HRA throughout the City. This rental was paid by direct electronic transfer on a month-to-month basis from HRA into the hotel's bank account, pursuant to written authorizations signed by the homeless families.

Preparatory to receiving this new guest population, which greatly exceeded its previous occupancy levels, the Inn invested some $1,500,000 in renovations of its premises, many details of which were suggested by HRA, and it evicted certain former tenants, to wit, a bar, a coffee shop, and a night club, in order to create room for an assortment of special-assistance programs for the homeless residents. In addition, the Inn made available, without extra charge, space in its lobby and lower level for on-site services supplied by seven Social Service employees, two nurses from the Department of Health, and two employees of the Board of Education.

Letters from HRA to Community Board 12 and Queens Borough President Claire Shulman indicated that once the homeless families began to occupy the facility, no other guests would be permitted to register at the Inn. Although there was no lower or upper limit to the amount of time a homeless family could stay at the hotel, it was HRA's intention that each placement would last until the family could be moved into a permanent dwelling, and a homeless family residing in the Inn for more than 30 days could only be evicted pursuant to the City's unlawful eviction statute, even if its shelter grant had previously been terminated by the HRA (Administrative Code of City of NY § 26-521).

HRA began transporting homeless families from the Catherine Street Shelter in Manhattan, which the HRA was converting into an assessment center, on February 11, 1992; and as of February 22, 1992, 108 homeless families had taken up residence at the Kennedy Inn.

The HRA has thus engaged to fill 150 rooms at the Inn with homeless families, and to use the former night club and common areas for the provision of services to the families, to the exclusion of all others. Even though the intended period of occupancy of each homeless family is somewhat indefinite, the rate of rent is fixed at $105 per room per day. It is therefore indisputable that the City entered into a master lease arrangement with the Inn, as distinguished from a "license," since the respondents obtained exclusive and absolute control

of the premises. In effect, a homeless housing center or complex was established.

Subject to the terms of their contract, the projected occupancy was not "a mere temporary privilege," revokable at the whim of either party (see, Miller v City of New York, 15 NY2d 34, 37; cf., Mauldin v New York City Tr. Auth., 64 AD2d 114). Moreover, judging from the manner in which rent was paid, the lease contemplated by the parties was a month-to-month tenancy (see, Cohen v Green, 21 Misc 334; Douglass v Seiferd, 18 Misc 188; 2 Rasch, New York Landlord and Tenant § 30:58, at 479 [3d ed]). At the least it was a tenancy at will, and not a freely revocable license (see, Real Property Law § 228; Larned v Hudson, 60 NY 102).

In consequence, the Supreme Court properly found that the "lease" at issue was subject to the land use review proceedings mandated by New York City Charter § 197-c, and that it should further be assessed under the "fair-share" provisions contained in New York City Charter §§ 203 and 204, as a "facility" founded "to meet city needs".

I am not unmindful of the enormous difficulties the City faces in coping with the epidemic of homelessness that now confronts it. However, I believe that the City has a counterbalancing obligation—embodied in the New York City Charter —to consider in good faith the needs and resources of the communities where it places its new shelters, and to subject its plans to open new facilities to public scrutiny.