John B. **HERRINGTON, III,** Plaintiff,

v.

George E. **VERRILLI,** Defendant.

**No. 99 Civ. 3045(CM).**

United States District Court,
S.D. New York.

July 12, 2001.

Stuart B. Pollack, Brooklyn, NY, for plaintiff.

Mickey A. Steiman, Hyde Park, NY, for defendant.

MEMORANDUM DECISION AND OR-
DER DENYING PLAINTIFF'S MO-
TION FOR SUMMARY JUDG-
MENT, GRANTING IN PART AND
DENYING IN PART DEFEN-
DANT'S MOTION FOR SUMMARY
JUDGMENT, AND GRANTING IN
PART PLAINTIFF'S MOTION TO
AMEND THE COMPLAINT

McMAHON, District Judge.

Plaintiff John B. Herrington III sues George E. Verrilli for breach of contract, trespass, conversion, negligence, declaratory and injunctive relief, and for treble

damages under the New York Real Property Actions and Proceedings Law § 853, for damage done to plaintiff's organ that was being stored in a space let by defendant. Defendant counterclaims for unpaid rent.

Plaintiff moves for summary judgment on the breach of contract and conversion claims, and seeks leave to file a second amended complaint. Defendant cross-moves for summary judgment on plaintiff's claims and on his counterclaim for unpaid rent.

## FACTUAL BACKGROUND

The sorry saga of the G.F. Adams organ ("the Adams organ") begins at St. Thomas Episcopal Church on Fifth Avenue in New York City, one of the "cardinal parishes" of the Episcopal Diocese of New York. The home of the United States' only residential choir school for boys, St. Thomas' enjoys an international reputation for the excellence of its liturgical music program. Its Choir of Men and Boys performs nearly every day during the school year, tours widely, and has released a number of recordings. The choir's concert performances are regularly reviewed in the Arts pages of The New York Times. *See, e.g.,* Allan Kozinn, *Decking out a "Messiah" But Hewing to Tradition,* N.Y. Times, Dec. 21, 2000 (reviewing a Messiah performance by the St. Thomas Choir). And its organist, Gerre Hancock, is among the best-known church musicians in the United States. So it is fair to say that St. Thomas' takes its music seriously.

At some point in the 1960s, St. Thomas' installed a tracker[1] organ built by Gilbert F. Adams in the gallery at the rear end of the nave. In or about 1993, the Vestry (the governing board of an Episcopal church) decided to replace the Adams organ with a new instrument. And that is where the story of our lawsuit begins.

The Vestry gave the instrument to the Virginia firm Taylor and Boody, which had been hired to construct its replacement, as part of the consideration for the new instrument, on the condition that Taylor & Boody remove the Adams organ from the church at no cost to St. Thomas'. (Steinman Aff. (Laufman Dep. at 64–66.) at Ex. B.)[2] Taylor and Boody engaged a man

---

[1] As described by Alfred J. Buttler, III, hired by plaintiff to examine the Adams organ, a "tracker" organ is distinct because of the method by which the air enters a specific pipe, or pipes, and creates musical notes by means of levers, rods (trackers) and leather covered valves that are mechanically connected to the keyboard. This is in contrast to other electro-mechanical methods, which allow a keyboard to be remote from the instrument.

[2] Plaintiff (whose musical acumen is unknown to the Court), describes the Adams organ as "one of the most magnificent organs ever built." (Pl. Mem. In Support of Mot. for Summary J. at 2.) However, there are legends about the Adams organ (all of which are *dehors* the record, but which have come to my attention through my acquaintance with church musicians in the metropolitan area), which suggest that Dr. Herrington's opinion was not universally shared. According to my favorite story (which may be apocryphal), the famous French organist Marie–Claire Alain, who was engaged to play the organ's dedicatory recital, rehearsed briefly and then insisted on playing the church's main organ (the Loring Memorial Organ) instead. The Adams was also reputedly disfavored by Dr. Hancock, and so was rarely played. There is precious little information in the record about why the Adams organ enjoyed such a brief tenure at St. Thomas'—mechanical action organs hundreds of years old are played daily in the cathedrals and churches of Europe, while this instrument, which had to have cost well into six figures to build, was replaced after only 25 years. However, Alan Laufman, who arranged for the storage of the Adams, stated in his deposition that the church decided that there had been "enough problems with the organ mechanically that they just wanted to remove it and start from scratch, but they

named Alan Laufman to help them to find a buyer for the Adams organ, and passed on to Laufman the obligation to remove the instrument from St. Thomas'. There is some suggestion in the record that Taylor and Boody actually gave the Adams organ to Laufman, but no documentation of any such transfer was presented to the Court.

Because Laufman could not afford to remove the organ himself, he contacted an organ builder named Lawrence Trupiano. Trupiano in turn located and contacted plaintiff John B. Herrington, III, who expressed a willingness to pay for the removal of the organ from the church. Laufman testified that he gave the organ to Herrington in exchange for his funding the removal of the organ. (Laufman Dep. at 65.) Plaintiff has produced an undated Indemnity Agreement in which Taylor & Boody agreed to donate the Adams organ to him in exchange for its removal and transport from the St. Thomas Church. (Herrington Aff. at Ex. 14.)[3]

Laufman needed a place to store the organ after its removal from St. Thomas Church. He spoke with a restorer of church organs, Susan Tattershall, who suggested that he contact defendant George Verrilli about using his warehouse in Germantown, New York. Laufman contacted Verrilli in the spring of 1994 to inquire about the availability of storage space. Laufman determined that the third floor of defendant's warehouse would be suitable for storage of the Adams organ on a "short term basis" until the instrument could be sold.

While Laufman was negotiating a space for the organ, Laufman and Herrington had no direct contact with one another. Herrington dealt directly with Trupiano, who dealt with Laufman. Of those three, Laufman was the only one with direct contact with defendant Verrilli.[4]

In the course of one or more telephone conversations, defendant and Laufman agreed that the rental cost of the storage space was to be $1.80 per square foot and that approximately 1,000 square feet were to be rented on a short term basis. According to Laufman, Verrilli carefully described the space on the third floor of the building to him. (Laufman Dep. at 35.)

The agreement for the use of Verrilli's space was memorialized in a July 8, 1994 letter from Verrilli to Laufman. Verrilli sent Laufman a key to the warehouse, and the letter said, in pertinent part:

> Enclosed please find a key to the warehouse in Germantown. The space has been set aside (a little bit more than a thousand square feet) for the storage of the St. Thomas pipe organ.... The annual rent is at $1.80 a square foot; a thousand square feet would be $1800 a year broken down into monthly payments or bimonthly payments as you wish. Those payments would be $150 a

---

also wanted an organ of a different style." (Laufman Dep. at 61.) The replacement instrument—known as The Hancock Organ, in honor of Dr. Hancock—is quite different from the Adams.

3. The very idea that an expensive musical instrument could change hands repeatedly in this way, for little or no consideration except "get it out of here," could be said to speak volumes about its perceived quality. Whatever the instrument's problems, the Court har-

bors no doubt that some congregation would have been delighted to receive the Adams organ and would have used it in worship for many years (though only a large church could have accommodated an organ of its size). Sadly, no such serendipitous fate awaited our instrument. Read on.

4. Laufman has passed away since his deposition was taken.

month and you may send them to George Verrilli . . .

(Herrington Aff. at Ex. 9.)

The key sent by Verrilli with the July 8, 1994 letter opened a padlock that directly accessed the third floor. Despite its designation, the third floor is at ground level. The building's loading dock opens directly into the third floor, so it is not necessary to go up or down steps to access the space. Moreover, the third floor is two stories high.

For Laufman's purposes, it was ideal, since there was room to "spread everything out so that we could organize things in a way would [sic] allow access for potential clients to get in and examine virtually every part of the organ, virtually every pipe." (Pollack Aff. (Laufman Dep. at 22) at Ex. 12.) However, the letter did not specify that the organ would be stored on the third floor, or in any particular location. Laufman understood the contract to refer to the space on the third floor,[5] and according to Tattershall, Verrilli had "agreed to offer to store [the] G.F. Adams Organ solely on the third floor of defendant's said warehouse." (Tattershall Aff. at ¶ 3.) She also claims to have told him that the space on the ground floor of the building—which was occupied by a woodworker, and was below grade—was unacceptable space for storage of the organ, and that no owner of the organ would or could agree to permit their organ to be stored on the ground floor of the warehouse. (Id. at ¶ 4.)

Beginning in July 1994, Laufman brought the dismantled parts of the Adams organ (along with two additional pipe organs) into the third floor of defendant's warehouse. Groups of related organ parts were segregated from other groups of related organ parts. Whatever its musical merit, the organ was in good physical condition at the time it was dismantled. Plaintiff paid Laufman $37,000 for his work. If Laufman were to find a church to buy the organ, plaintiff was not required to pay Laufman any further commission, but the purchaser would have to pay him $800. (Pollack Aff. (Laufman Dep. at 100) at Ex. 12.)

As of late October 1994, the agreed rental of $150 per month had not been paid for the months of July, August, September or October 1994. Defendant telephoned Laufman on October 21, 1994, and advised him that the rent would have to be paid or the three pipe organs would have to be removed. Laufman made arrangements with Herrington to send one year's rent. In November 1994, plaintiff sent a check in the amount of $1,440 (less than one year's rent) to defendant for "Storage/Adams organ." No further rent was ever tendered.

In the spring of 1995, defendant began negotiations with an eye toward leasing the entire Germantown warehouse. Beginning in April 1995, Verrilli telephoned Laufman, complaining about his failure to pay rent and telling him to remove the organs. According to Verrilli, Laufman did not answer the phone or respond to the many messages left on his answering machine. What transpired when they finally connected is a matter of dispute. Defendant maintains that Laufman initially objected to Verrilli's moving the organs,

---

**5.** Laufman gave the following testimony in his deposition:

Q. Did you ever tell Dr. Verrilli of any special requirements of any space that you were renting?
A. I think what happened instead of that was that I indicated my delight and plea-

sure at the space that was allocated for us because I was so pleased that we had a space that was two stories tall, that was readily accessible by a loading dock.
(Laufman Dep. at 111.)

but later agreed that defendant could move them if Laufman did not or could not do so himself. (Verrilli Aff. at ¶ 29–31). Laufman, testifying on behalf of plaintiff, contends that he never authorized Verrilli to move the organ. Nevertheless, at some point in 1995, defendant hired two people to move the Adams organ to the first floor of the building. The Adams organ remains there to this day.

Sometime in 1995—Laufman contends it was April, defendant says it was in the fall—Laufman went back to the Germantown warehouse and found that the organ was not in the space where it had initially been stored. According to Laufman, he was shocked because the space was completely empty, and the carefully-placed organ was nowhere to be found. Laufman called the defendant from the warehouse, and was told that the organ had been moved to another storage space in the building. Two men from the warehouse took Laufman to the new space, where he saw the organ sitting near water, its parts in a jumble. According to Laufman, it had already "sustained substantial damage."

It is unclear from the record whether Laufman's key to the third floor padlock would allow access to the organ in the space where it had been moved. According to Verrilli, as stated in his affidavit: "At all times, Mr. Laufman could freely enter the building, inasmuch as he had the key to the padlocked entrance door, remove any items he wished and to store any additional items he wished. At no time have I or anyone acting on my behalf exercised custody, control or dominion of any of the pipe organs, and Mr. Laufman has always been free to remove the organs. With Mr. Laufman's death, the plaintiff is certainly free to remove them as well." (Verrilli Aff. at ¶ 35.) This is contradicted by Verrilli's deposition testimony, in which the following exchange is found:

Q: Now, you mentioned in the first sentence that "enclosed please find a key to the warehouse in Germantown." Did that key permit access just to the space referred to in the second sentence?

A. No. It referred to the entire 10,000 square feet on the third floor of the building.

Q. Could that key be used to gain access to the warehouse itself?

A. To the third floor of the warehouse.

(Steinman Aff. (Verrilli Dep. at 16) at Ex. E.)

In Laufman's deposition, he stated that defendant "said he would send me a key to the new space but that has never happened." (Pollack Aff. (Laufman Dep. at 44) at Ex. 12.). Plaintiff Herrington concedes that no efforts have been made to move the organ since it was stored at the Germantown facility.

Several years passed with no further activity by either party. Finally, Laufman wrote to Herrington in April 1999, informing him that he had two inquiries about the Adams organ. The letter contains the following statement: "Unfortunately, I am unable to tell these potential buyers much of anything, because the organ is, as far as I know, still inaccessible.... It would be helpful to me if you could let me know what are your intentions in this matter. If you simply intend to walk away from it, then I may be able to file the lawsuit against Dr. Verrilli. If you don't want to abandon it, perhaps you cold [sic] give me some guidance as to what you think should be our next step." (Steinman Aff. at Ex. C.)

On April 27, 1999, Herrington filed the present lawsuit. Over 18 months later, on November 8, 2000, plaintiff made a de-

mand that the organ be returned in the same condition as when it was left with defendant. It was not returned.

## CONCLUSIONS OF LAW

Plaintiff has moved for summary judgment on the issue of liability. Plaintiff argues that a bailment contract was created, either when Laufman first entrusted the organ to the control of the defendant, or when defendant moved the organ from the third floor (at ground level) down to the first floor (below grade). As a result, he contends that the damage to the organ gives rise to a presumption of negligence on defendant's part, a presumption that defendant has not overcome.

Defendant argues that plaintiff was renting space, and that landlords are not insurers of their tenants' property. He also contends that the breach of a bailment contract claim should fail because the parties in this lawsuit are not in privity, and that a bailment is in essence a tort claim, which is barred by the Statute of Limitations. Defendant cross-moves for summary judgment on plaintiff's claims, and on his counterclaim for unpaid rent.

For the reasons stated below, plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment on his counterclaim are denied. Defendant's cross-motion for summary judgment on the breach of bailment contract claim is granted. Plaintiff's claims for negligence, trespass, and under the RPAPL are dismissed as they are barred by the statute of limitations. Plaintiff's motion for leave to amend the Complaint is granted in part.

### 1. Standards for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When presented with cross-motions for summary judgment, the Court must be particularly careful not to resolve factual disputes, but to view the evidence most favorably to plaintiff when deciding defendant's motion, and vice versa. *See, e.g., Ladson v. Union Local 272,* No. Civ. A. 92–2994, 1993 WL 405429, *4 (S.D.N.Y. Oct.1, 1993). Finally, when opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### 2. The Effect of Plaintiff's Choice of the Wrong District Court

Both parties to this action appear to have overlooked the fact that Germantown, New York—which, as the locus of defendant's warehouse, is the asserted basis for venue—is not in the Southern District of New York. After consulting a map, and placing a call to the Village Hall, I find that Germantown is located in Columbia County, which was at one time in the Southern District, but has not been since 1975. Thus, venue was improperly laid in this case.

Improper venue is not a jurisdictional defect, however. It can be waived by failure to assert it, as provided in Fed. R.Civ.P. 12(b) and 12(h)(1). Thus far, I am the only person who has raised the issue. Improper venue can also be cured by transfer under 28 U.S.C. § 1406, or by a transfer for convenience under 28 U.S.C. § 1404(a). *See, e.g., Ullah v. FDIC*, 852 F.Supp. 218 (S.D.N.Y.1994); McMahon, O'Sullivan & Finzi, *Venue, Federal Civil Practice*, New York State Bar Association 41 (1997 Supp.). No one has made such a motion. Therefore, any objection to venue has been waived and the Court must adjudicate the case, even though it should have been brought to my northern brethren. *See Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371 n. 1 (2d Cir.1966) (noting that because the right to attack venue is personal to the parties and waivable at will, a district court should not impose its choice of forum by deciding, on its own motion, that there was a lack of proper venue).

3. *The Initial Placement of the Organ in the Warehouse Created a Tenancy, Not a Bailment.*

On the undisputed facts of this case, no bailment was created when Laufman, on plaintiff's behalf, moved the organ into the third floor space.

■ In *Mays v. New York, N.H. & H.R. Co.*, 197 Misc. 1062, 1063–64, 97 N.Y.S.2d 909, 911 (Sup.App.Term 1950), the Court defined a bailment as follows:

A bailment is defined as a delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be. It is essential that there be either an actual or constructive delivery by the bailor as well as actual or constructive acceptance by the bailee.

*Id.* (quoting *Osborn v. Cline*, 263 N.Y. 434, 437, 189 N.E. 483 (1934)).

■ It is critical to distinguish between a contract of bailment and a lease. Loss of stored goods gives rise to a presumption of negligence in a bailment situation, but not when goods are stored by the owner on property leased by him. Thus, it is essential to a finding of bailment that the bailor's property be taken into the possession of the bailee, so that the bailee is responsible for its care and custody. *Osborn*, 263 N.Y. at 437, 189 N.E. 483

■ Whether a person simply rents a place to put his property or whether he has turned its possession over to the care and custody of another depends on the "place, conditions, and the nature of the transaction." *Id.* at 436, 189 N.E. 483. In *Osborn*, plaintiff's wife had parked their car in defendant's open air parking ground for automobiles. The parties disagreed as to whether an employee had advised her that it was safe to leave the car unlocked. Yet she did—leaving the car unlocked, with the key in the ignition. When she returned one hour later, the car was gone. *Id.* The court noted that "[a]ny house or lot owner may permit for a fee another to put his car on the premises without becoming a bailee or assuming any responsibility for its safety. It all depends on the facts." *Id.* at 437–38, 189 N.E. 483. The court remanded the case because the lower court treated Mrs. Osborn as plaintiff's bailee, rather than as his agent.

In *Hutton v. Public Storage Mgmt.*, 177 Misc.2d 540, 676 N.Y.S.2d 886 (2d Dep't 1998), plaintiff entered into a rental agreement for a storage space at defendant's self-storage facility. Plaintiff produced his

own lock for the storage space, and the rental agreement specifically provided that defendant would have neither the key nor the combination. There was no indication that plaintiff furnished defendant with a list of property stored there, and plaintiff had direct access to the storage facility by using a code provided by defendant. *Id.* at 887. The court held that on those facts, the relationship created was one of lessor and lessee, and not bailor and bailee. *Id.*

Similarly, in *Hogan v. O'Brien*, 123 Misc. 865, 206 N.Y.S. 831 (Sup.1924), defendant occupied a building in which he rented space for storage of automobiles. The plaintiff stored his car in the garage under an arrangement where he could put his car in and take it out at will at any hour of the day or night. He was given a key to the garage, and after the garage closed for the night, he could open the door, take his car, and return it without any supervision by the defendant or his employees. *Id.* at 866, 206 N.Y.S. 831. There were placards around the building that defendant would not be responsible for the cars. Noting that a bailment is a "delivery of something of a personal nature by one party to another, to be held according to the purpose or object of the delivery, and to be returned or delivered over when that purpose is accomplished," *id.*, the court held that defendant was not a bailee of plaintiff's car. The court analogized this case to the renting of stalls in a market. For a price, defendant gave the customer permission to bring his car in from the street and stand it in his building—but he "had no control over it, and did not watch or assume to guard or protect it.... He did nothing more or different than the owner of the market does who rents out a stall." *Id.* at 868, 206 N.Y.S. 831.

Courts' willingness to find a bailment ordinarily depends on how much control defendant exercised over plaintiff's property. *See, e.g., Faller v. Scali, McCabe, Sloves, Inc.,* 198 A.D.2d 96, 603 N.Y.S.2d 469 (1st Dep't 1993) (finding a bailment where an advertising agency took possession of a photographer's transparencies); *Sealey v. Meyers Parking System,* 147 Misc.2d 217, 555 N.Y.S.2d 574 (Civ.Ct. 1990) (finding an implied bailment in a "park and lock" garage situation, even though plaintiff had not surrendered keys to attendants, because the garage was in a permanently enclosed structure, and had an attendant who checked tickets and authorization stickers); *Conboy v. Studio 54, Inc.,* 113 Misc.2d 403, 449 N.Y.S.2d 391 (Civ.Ct.1982) (finding that a bailment was created when plaintiff checked coat at a discotheque, and that failure to return it on demand gave rise to a *prima facie* showing of negligence).

The case at bar presents a hybrid situation between the bailment and lease contracts above. The contract, or at least a portion of it (more on this issue below), was reduced to a writing signed by the party to be charged (Verrilli) in the form of the letter dated July 8, 1994. By its terms, it appears to be for the hire of space (a lease) rather than for safekeeping of the organ. The letter said, in pertinent part: "The space has been set aside (a little more than a thousand square feet) for the storage of the St. Thomas Pipe organ. To facilitate our using this storage space I have two people that you may contact ..." (Herrington Aff. at Ex. 9.) Per the terms of that letter, Laufman was given a key to the premises.[6] Thus, like the plaintiff in *Hogan*, plaintiff (through Laufman, who acted for him) did not relinquish full possession of the organ.

**6.** Laufman's role as Herrington's agent is discussed *infra.*

Plaintiff rightly points out that, in a bailment situation, the burden of proof is on the bailee to explain the loss or destruction of the object, since only the bailee had (or could have had) first hand knowledge of that loss or destruction. This is not case where, as appears here, plaintiff (through Laufman) and defendant shared possession and control of the organ. It is undisputed that, up to the point that defendant moved the organ, Laufman had a key to the premises; that he had the ability to access the organ; and that he was able to bring and remove parts without any involvement by the defendant. And there is no evidence that Verrilli undertook any special duty to monitor the storage area or to look after the organ.

Thus, at the time the organ was originally delivered to the Verrilli warehouse, the situation was more closely analogous to the non-bailment "park and lock" situations, such as in *Hogan,* than to a bailment. As a matter of law, the agreement between the parties is more properly viewed as a lease for storage space, rather than as a bailment.

4. *No bailment was created when the organ was moved to the ground floor.*

 Plaintiff argues that, even if the parties did not initially create a bailment contract, a bailment was created by the defendant when he moved the Adams organ from the third floor to the first floor.

At first blush, it appeared that the factual premise underlying this allegation was in dispute. Defendant contended that plaintiff continued to enjoy access to the organ all times, even after it was moved, while plaintiff argued that the key gave access only to the third floor space, not to the first floor space. However, Verrilli's assertion that plaintiff always enjoyed access to the organ seems to be contradicted by his deposition testimony. (See Stein-

man Aff. (Verrilli Dep. at 16) at Ex. E.) Under the law of this Circuit, a Court considering a motion for summary judgment may not rely on an affidavit that contradicts a party's deposition testimony. *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"); *Raskin v. The Wyatt Company,* 125 F.3d 55, 63 (2d Cir. 1997) ("[W]e follow the rule that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). Therefore, Verrilli's affidavit does not raise a disputed issue of fact; for purposes of this motion, I must conclude that plaintiff was not able to access the organ after 1995, and thus, that defendant had exclusive possession and control over the instrument from the time it was moved.

Nonetheless, plaintiff's theory that his relationship with Verrilli was somehow transformed from lease to bailment has no support at law. Tenancies and bailments are two separate and distinct legal relationships, and a contract cannot create both a tenancy and a bailment at the same time. I have already concluded that the parties initially created a tenancy, not a bailment. Plaintiff's contention that defendant's moving the organ wrongfully would thus fall under the rubric of "breach of lease" rather than "breach of bailment." There was no new delivery by plaintiff and new acceptance by defendant, which, as noted above, are hallmarks of a bailment. *See Mays v. New York,* N.H. & H.R. Co., 197 Misc. 1062, 97 N.Y.S.2d 909, 911 (1st Dep't 1950). And there is certainly no evidence that the parties' minds ever met on the terms of a new "bailment" contract;

to the contrary, plaintiff contends that moving the organ was wholly unauthorized. So, breach of lease-perhaps; conversion—perhaps; bailment—no.

5. *Plaintiff's Non–Contractual Claims are Barred by the Statute of Limitations*

Plaintiff's common law claims for damages all arise in tort, and are now barred by the statute of limitations. Plaintiff's statutory claim under RPAPL § 853 is similarly barred.[7]

Plaintiff has asserted claims of negligence, trespass and conversion, as well as violation of RPAPL § 853, which provides that persons ejected or put out of real property in a forcible manner are entitled to recover treble damages from the wrongdoer. Claims in negligence, trespass and conversion are governed by the three-year limitations period set forth in C.P.L.R. § 214(4). *See, e.g., Tischler Roofing & Sheet Metal Works Co. v. Sicolo Garage Inc.*, 64 Misc.2d 825, 316 N.Y.S. 2d 453 (1st Dep't 1970) (noting the three-year limitations period for a negligence claim); *Weichert v. O'Neill*, 245 A.D.2d 1121, 1122, 667 N.Y.S.2d 527, 528 (4th Dep't 1997) (noting the three-year limitations period for a trespass claim); *Gold Sun Shipping Ltd. v. Ionian Transp., Inc.*, 245 A.D.2d 420, 666 N.Y.S.2d 677 (2d Dep't 1997) (noting three-year statute of limitations for conversion

claim). Wrongful eviction claims, such as those governed by those in RPAPL § 853, are governed by the one year statute of limitations applicable to intentional torts. McKinney's RPAPL § 853; *Gold v. Schuster*, 264 A.D.2d 547, 694 N.Y.S.2d 646 (1st Dep't 1999).

There is no dispute that the organ was moved from the third floor of the warehouse to the ground floor sometime between April and September 1995. By his own admission, Laufman visited the site in 1995. At that time, he saw that the organ had been moved, and already had "sustained substantial damage." (Laufman Dep. at 45.) This action was commenced on April 27, 1999, almost four years after Laufman's discovery—one year after the statute of limitations on these claims had expired. While plaintiff argues that the organ sustained even more damage over time that made it virtually useless, his agent was on notice no later than September 1995 that "substantial damage" had been done. The clock began to run at that point.

Of course, a claim for conversion arises only upon a demand by the bailor for return of the bailed property and a refusal or inability to do so by the bailee. *Solomon R. Guggenheim Fdn. v. Lubell*, 77 N.Y.2d 311, 319, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991). Yet where conversion is alleged, an owner of a property who

---

7. Ironically, if a bailment had been created by defendant's removal of the organ, that claim, too, would be time-barred. In determining the applicable statute of limitations for breach of a bailment contract, the courts look to the underlying theory of recovery. If the gravamen of the cause of action is predicated on a tort, such as conversion or negligence, courts will construe the claim as sounding in tort. *See Tischler Roofing & Sheet Metal Works Co. v. Sicolo Garage Inc.*, 64 Misc.2d 825, 316 N.Y.S.2d 453 (1st Dep't 1970) ("While the bailment transaction arose in contract, the obligation or liability is the common-law duty

of due care and the grounds of recovery are defendants' negligence."); *Katz v. Kar*, 192 A.D.2d 695, 696, 597 N.Y.S.2d 135 (2d Dep't 1993) ("[T]his action, purportedly to recover damages for breach of a bailment contract, is, in fact, an action to recover damages for conversion."); *New Windsor Assocs. v. Norstar Bank of the Hudson Valley*, 114 A.D.2d 1017, 1018, 495 N.Y.S.2d 455 (2d Dep't 1985) (finding no evidence of a bailment contract and treating the action as a "garden-variety" conversion action). As discussed below, claims of negligence, trespass and conversion all have a three year statute of limitations.

has knowledge of its location cannot unreasonably delay making demand upon the person possessing the property. *Id.* The demand that is necessary to start the running of the limitation period must be made within a reasonable period of time. *SongByrd v. Estate of Grossman,* 206 F.3d 172, 183 (2d Cir.2000). The first demand made for the return of the organ was a letter dated November 8, 2000 from plaintiff's counsel to defendant's counsel— one and a half years after the initial lawsuit was filed. Plaintiff offers no explanation for the delay. This Court considers the five years plaintiff took to demand return of the organ after learning that it had been moved to be unreasonable as a matter of law.

6. *The Motion for Leave to Amend the Complaint is Granted in Part and Denied in Part.*

Plaintiff seeks to amend the First Amended Complaint to include claims of fraud in the inducement and breach of the lease agreement.[8] To support the new claims, plaintiff argues that the agreement was to let space on the third floor of the warehouse, and that defendant induced Laufman into renting the space because it was clean, well-lighted, dry and accessible. Plaintiff also seeks to add Christine Verrilli as a defendant.

Fed.R.Civ.P. 15(a) permits a party to amend a pleading after a responsive pleading has been served "only by leave of court or by written consent of the adverse party." This rule also provides, however, that "leave shall be freely given when justice so requires." *Id.* The decision to grant leave to amend falls within the sound discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). A court may deny leave where the proposed causes of action would fail to state a claim upon which relief can be granted. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339 (2d Cir.2000).

a. Breach of Lease Agreement

The record shows that Laufman and Verrilli negotiated an agreement for the letting of space in defendant's Germantown warehouse sometime in June or early July of 1994. In the course of one or more telephone conversations, defendant and Laufman agreed that the rental cost of the storage space was to be $1.80 per square foot, and that approximately 1,000 square feet were to be rented on a short term basis. According to Laufman, Verrilli carefully described space on the third floor of the building to him. (Laufman Dep. at 35.) The record also contains a letter from Verrilli to Laufman that included a key to the warehouse. The letter says: "The space has been set aside (a little bit more than a thousand square feet) for the storage of the St. Thomas pipe organ.... The annual rent is $1.80 a square foot; a thousand square feet would be $1800 a year broken down into monthly payments or bimonthly payments as you wish. Those payments would be $150 a month and you may send them to George Verrilli ...." That letter was signed by George Verrilli. It was not countersigned by Laufman.

■ Because the arrangement between the parties was not a lease for more than a year (and is more properly construed as an at-will tenancy),[9] New York General Obli-

---

8. A lease is a contract, and claims for breach of contract are governed by a six year statute of limitations. C.P.L.R. § 213(2); *Swartz v. Berkshire Life Ins. Co.,* 120 F.3d 351, 360 (S.D.N.Y.2000).

9. "A tenancy at will arises where lands or tenements are let by the lessor to the lessee to hold at the will of either party by force of which the lessee is in possession. A lease at the will of one of the parties is equally at the

gations Law § 5–703 does not require that the lease agreement be in writing, subscribed by the party to be charged.[10]

While a writing was not necessary in this case, in order for an agreement, oral or written, to be enforceable as a lease, all the essential terms must be agreed upon by the parties. *Davis v. Dinkins,* 206 A.D.2d 365, 366–67, 613 N.Y.S.2d 933 (2d Dep't 1994); *Mur–Mil Caterers v. Werner,* 166 A.D.2d 565, 560 N.Y.S.2d 849. These essential terms include the area to be leased, the duration of the lease, and the price to be paid. *See Bernstein v.1995 Assocs.,* 185 A.D.2d 160, 586 N.Y.S.2d 115 (1st Dep't 1992). If any of these essential terms are missing and are not otherwise discernible by objective means, a lease has not been created. *See Miller v. City of New York,* 15 N.Y.2d 34, 255 N.Y.S.2d 78, 203 N.E.2d 478 (1964).

■ While the parol evidence rule bars the admission into evidence of conversations, negotiations and agreements made by the parties prior to or contemporaneously with the execution of a written lease for the purpose of varying or contradicting what would otherwise be an unambiguous written lease, *see Levchuk v. Briksza,* 126 Misc.2d 369, 481 N.Y.S.2d 998 (N.Y.Civ.Ct. 1984), there is no bar to the admission of an oral agreement even if some (but not all) of its terms happen to be memorialized in a writing. It is a well-settled rule that where a writing covers only part of an oral contract, the unwritten part may be shown by parol so long as it is not inconsistent with and contradictory of the writing. *Cooper v. Payne,* 186 N.Y. 334, 78 N.E. 1076 (1906); *Sullivan v. Franzreb,* 148 A.D. 728, 132 N.Y.S. 1117 (Sup.Ct.1912) (holding that parties are not precluded from offering parol testimony as to the understanding between the principals, if the whole contract was oral, but only part of it reduced to writing). Also, where the terms of a contract are ambiguous, parol evidence may be admitted to explain them, though not to vary or modify them.

■ Defendant takes the position that the July 1994 letter is the entire agreement between the parties—the lease. Plaintiff contends that the parties reached an oral agreement, and that the letter (which Laufman never signed and was apparently not asked to sign) does not completely reflect the terms of that agreement. This issue will have to be resolved by a jury. So will the meaning of the ambiguous phrase, "The space has been set aside . . .", which could logically refer to any space or to specific space within the warehouse.

will of the other party. The law does not recognize a tenancy at the will of one of the parties merely, but implies that it shall be also at the will of the other party. The fact that a rent is reserved will not necessarily prevent the tenancy from being one at will. So also the tenancy may be one at will where the lease expressly so provides, though the rent reserved is payable periodically." *Wood v. Husted,* 83 A.D. 174, 82 N.Y.S. 631 (2d Dep't 1903).

**10.** McKinney's General Obligations Law § 5–703 states:

1. An estate or interest in real property, *other than a lease for a term not exceeding*

*one year* . . . cannot be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the person creating, granting, assigning, surrendering or declaring the same, or by his lawful agent, thereunto authorized by writing.

When a contract can be terminated *at will* by either party, as a matter of law, it is not subject to the Statute of Frauds requirement of a writing for an agreement not performable within one year. *See Christian Rupert of New York, Inc. v. Mallinckrodt,* 110 A.D.2d 548, 488 N.Y.S.2d 162 (1st Dep't 1985).

■ Defendant initially contended that there was no privity of contract, and hence no legally cognizable relationship, between plaintiff and defendant, because Laufman negotiated the leased space on plaintiff's behalf, and defendant had no existing contract with plaintiff.[11] However, there is really no dispute that Laufman was acting as Herrington's agent, and it is well settled that a principal is in privity with his agent's agent, or with anyone else his agent deals with on his behalf. *See Schneider v. Lazard Freres & Co.,* 159 A.D.2d 291, 552 N.Y.S.2d 571 (1st Dep't 1990). Wherever any express or implied authority to appoint a sub-agent is given or allowed by the principal, a privity is created between them. *See Bank of the Metropolis v. New England Bank,* 47 U.S. 212, 6 How. 212, 12 L.Ed. 409 (1848). "The relation of agency exists between the principal and authorized sub-agent. Persons employed by an agent to perform the work of a principal are employees of the principal and not the employees of the agent. The subagent owes to the principal the greatest degree of loyalty. The obligation which he owes to the principal is the same as that of any agent." *Marra v. Katz,* 74 Misc.2d 1010, 347 N.Y.S.2d 143 (Sup.Ct.1973) (citing N.Y. Jur. Agency § 154).

Laufman was hired by Herrington, through Trupiano, to remove the organ from St. Thomas' up to Germantown. Neither party disputes that Laufman had the express authority to enter into this agreement. Laufman was therefore the agent of Herrington's agent, Trupiano. Because Laufman dealt with Verrilli on Herrington's behalf, plaintiff and defendant are in privity.

Because this Court is already treating the 1994 agreement between Laufman and Verrilli as a lease (rather than a bailment contract), and because there is considerable dispute over the specific terms of the agreement to let space in defendant's warehouse, justice requires allowing plaintiff to pursue this theory of recovery. There is no prejudice to defendant in permitting the amendment, even at this late date. Despite his arguments of lack of privity, defendant has been pursuing a counterclaim for unpaid rent on a theory of breach of the lease agreement. Any amendment to allow the plaintiff to pursue that same theory would not put the defendant at any disadvantage, nor would it require any additional discovery. It simply converts plaintiff's claim from a legally erroneous theory (breach of bailment contract) to one that is legally tenable.

Therefore, this amendment is allowed.

### b. Fraud

■ Plaintiff's motion to amend the complaint to include a fraud in the inducement claim is denied as futile. To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance. *Keywell Corp. v. Weinstein,* 33 F.3d 159 (2d Cir.1994); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987).

■ Plaintiff alleges that the material false representation made by defendant was that the organ would be stored within a certain space on the third floor of the warehouse. There is not a scintilla of

---

**11.** Not surprisingly, defendant abandons the privity argument in his counter-claim for un- paid rent.

evidence that defendant intended to defraud plaintiff at the time the lease was made, or that defendant wrongfully induced plaintiff (via Tattershall and Laufman) to rent space in his warehouse by enticing them with the third floor while harboring a secret intention to move the organ elsewhere. The undisputed evidence suggests that the idea of moving the organ arose when Verrilli had an opportunity to rent the third floor to a paying tenant—which plaintiff was not. Because no reasonable jury could conclude that defendant's conduct amounted to fraud, plaintiff's motion to amend the First Amended Complaint to include a fraud claim is denied.

### c. Christine Verrilli

Finally, plaintiff seeks to include Christine Verrilli, the wife of defendant George Verrilli as an additional party-defendant, since George testified at his deposition that he owns the warehouse jointly with his wife. However, there is no evidence that Mrs. Verrilli entered into an agreement with Laufman or Herrington, and the suit was brought against Mr. Verrilli personally, not against the Germantown facility. The motion for leave to add Mrs. Verrilli is denied.

### 7. *The Cross Motion for Summary Judgment for Reasonable Rent is Denied*

Verrilli has counterclaimed for the reasonable rental value of the space actually occupied by the Adams organ from April 1995 to present, and has moved for summary judgment on his counterclaim for unpaid rent. It is undisputed that plaintiff has paid no rent for use of any space since early in 1995—some six years and more. Nonetheless, because it is not clear who is actually in breach of the lease, because there is no evidence as to the fair value of rental space other than on the third floor of the building (and we know that the organ has not been on the third floor for years), and because of the possibility that defendant will be found to have breached the lease by removing the organ, thus raising the spectre of set-off, I decline to grant that motion.[12]

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and plaintiff's claims for trespass, negligence, conversion, and under RPAPL § 853 are dismissed as time-barred. Defendant's cross-motion for summary judgment on plaintiff's breach of bailment contract claim is granted, but his motion for summary judgment on the counterclaim for unpaid rent is denied. Plaintiff's motion for leave to amend the Complaint is granted in part.

The pre-trial order in this case was due to be filed last October. It has not been filed to this day. The parties are directed to file a Joint Pre-Trial Order, together with trial briefs, proposed voir dire questions, jury instructions, and *in limine* motions (if any), by August 17, 2001. The parties will be summoned to a final pre-trial conference in September or October, and the case will be calendared for trial at the earliest opportunity, subject to the Court's criminal calendar.

This constitutes the decision and order of the Court.

---

12. Lest plaintiff's amended complaint spawn another round of motions, I take this opportunity to advise the parties that there are disputed issues of fact concerning whether Verrilli's removal of the organ to a different location in the warehouse constituted a breach of the parties' lease agreement. Those issues preclude an award of summary judgment to either side.