OPINION OF THE COURT
Renwick, J.
The Women’s Interart Center (WIC), a not-for-profit cultural organization in Manhattan’s Hell’s Kitchen, commenced two separate actions with regard to properties it leases from the City of New York (the City) and which it intends to purchase and develop into rehearsal studios and a cultural center. The two actions have been consolidated for a joint trial. In the first action, WIC challenges the City’s termination of a contract to sell the subject properties to WIC. In the second action, WIC *19 challenges Clinton Housing Development Fund Corp.’s (CHDFC) attempt to evict WIC from the same properties after the former acquired a putative “net lease” of the same property from the City. This appeal involves a ruling in WIC’s favor in the second action, declaring that CHDFC lacks standing to commence eviction proceedings against WIC.
WIC has been involved since 1971 with theatrical productions and the support of visual artists, writers, and smaller theatrical companies, as well as others. In July 1971, WIC began to lease space at 549 West 52nd Street from the City. The lease is month to month. In the past, WIC has used its space at 549 West 52nd Street as a theater and art gallery, and for workshops, among other things. Due to the terrible condition of the building, however, WIC ceased presenting public programming there. On January 25, 1996, WIC leased part of the second floor at 500 West 52nd Street from the City to be used as a theater. It is WIC’s sole venue for public programming.
Beginning in the 1990s, WIC sought to purchase the building at 549 West 52nd Street, and an adjacent City-owned property consisting of vacant garages, for a nominal sum to create a cultural facility. The building’s owner, the Department of Housing Preservation and Development (HPD), was to transfer ownership to defendant New York City Economic Development Corp. (EDC) which would then sell it and the adjacent property to WIC for two dollars. In August 2001, EDC and WIC executed a contract, which included a development plan, for the sale of the two City-owned parcels, each for one dollar. Reportedly, when all the conditions had not been met, EDC terminated the contract and the project in December 2002.
In April 2003, WIC commenced a federal action, raising both federal and state claims against the City and others. The two federal claims were a First Amendment retaliation claim and an equal protection claim. After completion of discovery, in an order dated May 23, 2005, the district court granted the defendants summary judgment dismissing WIC’s federal claims. The district court declined to exercise supplemental jurisdiction over the state constitutional and common-law claims and thus dismissed those claims for lack of subject matter jurisdiction, but without prejudice (2005 WL 1241919, 2005 US Dist LEXIS 10027 [SD NY 2005]). WIC then commenced the first action (index No. 109017-07) against EDC, for breach of contract, and the City, for tortious interference with WIC’s contract with EDC.
*20 Meanwhile, on or about April 15, 1999, CHDFC and the City entered into an agreement that they called a “net lease,” which was extended on October 11, 2007. The agreements cover multiple buildings, including 500 West 52nd Street and 543-549 West 52nd Street. The term of each contract is month-to-month. The rent paid by CHDFC for the entire term is one dollar and “such other amounts as shall be due and payable to [the City] hereunder.” Each agreement states, “The sole and exclusive relationship of [the City] and [CHDFC] hereunder shall be that of landlord and tenant. [CHDFC] is not and shall not be deemed to be an agent ... of [the City] by virtue of this Net Lease.” Each contract says that CHDFC shall operate and manage the premises.
On March 31, 2006, the City sent WIC a letter regarding 500 West 52nd Street, stating, “effective May 1, 2006, [CHDFC] will assume management of the property that you currently lease from the Department of Housing Preservation and Development” and instructing WIC to send rent payments to CHDFC. On March 29, 2007, the City sent WIC a similar letter regarding 549 West 52nd Street for the period April 1, 2007 onward.
In August and September 2007, CHDFC informed WIC that it was terminating the latter’s tenancies at 500 and 549 West 52nd Street. On March 24, 2008, CHDFC commenced holdover proceedings against WIC in Civil Court with respect to both buildings. On the same day, WIC commenced the second action in Supreme Court, seeking a declaratory judgment and a permanent injunction.
CHDFC then answered and asserted affirmative defenses. Supreme Court removed CHDFC’s landlord-tenant petitions from Civil Court and consolidated them into the second action. After discovery, CHDFC moved for summary judgment dismissing the complaint and remanding the landlord-tenant cases to Civil Court. On August 19, 2010, the court denied CHDFC’s motion for summary judgment in the second action. Instead, the court declared that WIC was entitled to a declaratory judgment that CHDFC lacked authority to terminate or otherwise encumber the WIC tenancies at issue here because the “Net Lease,” the April 15, 1999 agreement between the City, acting through HPD, and CHDFC, constituted merely a “management agreement” respecting the subject WIC premises (2010 NY Slip Op 32242ÍUJ, *7, *10 [2010]). This appeal followed.
CHDFC argues that Supreme Court erred when it declared that it lacked standing to institute an eviction proceeding *21 against WIC. CHDFC contends that the agreement between it and the City is by its terms a net lease and not a contract for management services. WIC, however, argues that the agreement, although designated as a “net lease,” is by its terms a contract for management services. If the proof supports WIC’s position, CHDFC’s action against WIC would be illegal because as an agent of the landlord, it would not have standing to maintain an eviction proceeding (see RPAPL 721; see also Key Bank of N.Y. v Becker, 88 NY2d 899 [1996]).
To determine whether the underlying agreement is a net lease or a contract for management services, its contents must be examined in order to see what interest the parties intended to pass (Statement, Inc. v Pilgrim’s Landing, 49 AD2d 28, 33 [1975]). The mere fact that the agreement is referred to as a “net lease” does not transform it into one (Feder v Caliguira, 8 NY2d 400, 404 [1960]; Matter of Davis v Dinkins, 206 AD2d 365, 366 [1994], lv denied 85 NY2d 804 [1995]; American Jewish Theatre v Roundabout Theatre Co., 203 AD2d 155, 156 [1994]; 74 NY Jur 2d, Landlord and Tenant § 2). Rather, the court must look to the rights and obligations that the agreement confers to determine its true nature (American Jewish Theatre, 203 AD2d at 156; Feder, 8 NY2d at 404).
The critical question in determining the existence of a lease establishing a landlord-tenant relationship is whether exclusive control of the premises has passed to the tenant (see Feder, 8 NY2d at 404; Matter of Davis, 206 AD2d at 366; American Jewish Theatre, 203 AD2d at 156; Ferrer v Dinkins, 218 AD2d 89, 93 [1996], lv denied 88 NY2d 801 [1996]; Slutzky v Cuomo, 114 AD2d 116, 118 [1986], appeal dismissed 68 NY2d 663 [1986]). If this control has passed, even though the use is restricted by limitations or reservations, a landlord-tenant relationship is established (see Feder, 8 NY2d at 404; Layton v A. I. Namm & Sons, Inc., 275 App Div 246, 249 [1949], affd 302 NY 720 [1951]). From our review of the record, we are satisfied that no genuine issue of fact is presented as to whether this control was passed. It is clear from the record that CHDFC was granted sufficient control to give rise to a landlord-tenant relationship.
A review of some of the terms contained in the “net lease” demonstrates that CHDFC had exclusive control and possession of the leased premises. Like a typical commercial net lease, the agreement imposes the responsibility for all expenses arising from the property, including the costs of repairs of every nature, utilities and insurance, upon the tenant (see First Fed. Sav. & *22 Loan Assn. of Rochester v Minkoff, 176 AD2d 1049, 1051 [1991]; Nextel of N.Y. v Time Mgt. Corp., 297 AD2d 282, 283 [2002]). CHDFC also bears the cost of expenses of leasing a portion of the premises to residential and commercial tenants. In addition, CHDFC agreed to indemnify and defend the City for any damages or injury that occurred to any property or person because of its use of the leased premises. Finally, CHDFC was granted sole authority to maintain legal actions against month-to-month tenants, like WIC, for the collection of rents and evictions.
The City did reserve to itself certain rights regarding the leased premises, but these reserved rights were completely in line with the type of reservations that are permitted in a lease (see Statement, Inc., 49 AD2d at 33; Schlesinger v Rockefeller Ctr., 119 AD2d 462 [1986]). For instance, the City reserved to itself the right to inspect the common area of the premises at any time and the other areas at reasonable times, as well as to examine and audit the books and records pertaining to the lease premises. It also reserved to itself the rights to cure a default in CHDFC’s obligations that “create[s] a risk of immediate harm or loss to persons or property.” Thus, the City’s right of entry to the leased premises was limited strictly to those circumstances that were covered by the terms of the lease (see American Jewish Theatre, 203 AD2d at 156; Miller v City of New York, 15 NY2d 34, 38 [1964]).
According to the type of functions CHDFC is required to provide under the agreement and the limited qualitative restrictions placed on its authority, we find that the total nature of the agreement reflects that the parties entered into a lease agreement rather than a contract for management services. Indeed, the agreement does not subject CHDFC to close supervision by the City. Nor does it narrowly circumscribe CHDFC’s authority over the building or its use of the rent collected.
In contrast, a management contract is defined merely as a service contract (see General Obligations Law § 5-903), pursuant to which a manager essentially collects rent and provides day-to-day management of the building (see e.g. Harris v Adams & Co. Real Estate, 62 Misc 2d 749, 753 [Civ Ct, NY County 1970]). While property management responsibilities are also part and parcel of net leases, a managing contract does not delegate such an extensive dominion and control over the premises, as delegated here, to constitute a lease (see Slutzky, 114 AD2d at 118).
Accordingly, the order of the Supreme Court, New York County (Karen S. Smith, J.), entered August 23, 2010, which, to *23 the extent appealed from as limited by the briefs, denied defendant CHDFC’s motion for summary judgment dismissing the complaint and for an order severing the summary holdover proceedings and transferring them to Civil Court, and upon a search of the record, granted partial summary judgment to plaintiff WIC and declared in its favor, should be modified, on the law, to vacate the grant of partial summary judgment to plaintiff and the declarations in its favor, and to grant CHDFC’s motion to the extent of declaring that CHDFC has standing pursuant to Real Property Actions and Proceedings Law § 721 (10) to commence eviction proceedings with regard to WIC’s tenancy at 500 West 52nd Street and 549 West 52nd Street, and otherwise affirmed, without costs. The intervenor City’s appeal from the order of the same court (Cynthia S. Kern, J.), entered March 11, 2011, which, to the extent appealed from, denied its purported motion to renew, should be dismissed, without costs, as taken from a nonappealable order.
Mazzarelli, J.P., Saxe, Richter and Abdus-Salaam, JJ., concur.
Order, Supreme Court, New York County, entered August 23, 2010, modified, on the law, to vacate the grant of partial summary judgment to plaintiff and the declarations in its favor and grant defendant Clinton Housing Development Fund Corp’s motion to the extent of declaring that Clinton Housing Development Fund Corp. has standing pursuant to Real Property Actions and Proceedings Law § 721 (10) to commence eviction proceedings with regard to plaintiffs tenancy at 500 West 52nd Street and 549 West 52nd Street, and otherwise affirmed, without costs. Appeal from order, same court, entered March 11, 2011, dismissed, without costs, as taken from a nonappealable order.